**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRACY DEFENDERS FUND,<br>Plaintiff,<br>v.<br>U.S. DEPARTMENT OF JUSTICE,<br>Defendant. | Civil Action No. 25-2791 (CKK) |

**MEMORANDUM OPINION**
(September 30, 2026)

This case concerns multiple Freedom of Information Act ("FOIA") requests submitted by Plaintiff Democracy Defenders Fund ("DDF") to the Department of Justice ("DOJ") regarding the investigative files of Jeffrey Epstein and DOJ's handling thereof. DDF now moves for summary judgment on its requests for expedited processing under DOJ's regulations and the "compelling need" prong of the FOIA statute. The Court concludes that DDF is entitled to expedited processing as a matter of law under DOJ's regulations because its requests relate to matters of "widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." However, the Court determines that DDF is not entitled to expedited processing as a matter of law under the "compelling need" prong of the FOIA statute because DDF has not shown that it is "primarily engaged in disseminating information."

Accordingly, upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **GRANT IN PART** and **DENY IN PART** DDF's [15] Motion for Summary Judgment.

[1] The Court's consideration has focused on Plaintiff's Second Amended Complaint and embedded attachments, Dkt. No. 14 ("Am. Compl."); Plaintiff's Memorandum in Support of its Motion for Summary Judgment and attachments thereto, Dkt. No. 15-2 ("Pl.'s Mem."); Defendant's Memorandum in Opposition, Dkt. No. 20 ("Def.'s Opp'n");

## I. BACKGROUND

This case concerns multiple Freedom of Information Act ("FOIA") requests submitted by Plaintiff Democracy Defenders Fund ("DDF") to the Department of Justice ("DOJ") regarding the investigative files of Jeffrey Epstein and DOJ's handling thereof. Relevant here are DDF's July 22, 2025, request to DOJ's Criminal Division ("DOJ CRM") and its July 28, 2025, requests to DOJ CRM and the Office of the Attorney General ("OAG")/Office of the Deputy Attorney General ("ODAG"). DDF has moved for summary judgment on its request for expedited processing of these submissions.

The Court shall begin by detailing the media environment at the time DDF submitted its requests, as it is essential to determining whether DDF is entitled to expedited processing. In doing so, the Court draws from DOJ's Response to DDF's Statement of Undisputed Material Facts, citing only those statements to which DOJ either "admit[ted] that the record before the agency includes reporting supporting [such] statement" or "admit[ted] that an article included in Plaintiff's fee waiver request includes reporting supporting [such] statement." Def.'s Resp., Dkt. No. 20-1 ¶¶ 1–27. The Court shall then provide background on DDF's FOIA requests and the underlying litigation before turning to the merits of DDF's motion for summary judgment.

### A. The Epstein Files[2]

In 2019, Jeffrey Epstein was indicted and arrested on federal charges for sex trafficking underage girls. Def.'s Resp. ¶ 2. He died in prison shortly thereafter. In 2021, a jury convicted

---

Defendant's Response to Plaintiff's Statement of Undisputed Material Facts, Dkt. No. 20-1 ("Def.'s Resp."); and Plaintiff's Reply, Dkt. No. 21 ("Pl.'s Reply").

[2] Consideration of DDF's request for expedited processing requires consideration of the media environment during the relevant period. This section details that environment as conveyed in Defendant's Response to Plaintiff's Statement of Undisputed Material Facts, Dkt. No. 20-1 ("Def.'s Resp."). As mentioned above, the Court cites only those statements to which DOJ "admit[ted] that the record before the agency includes reporting supporting [such] statement" or "admit[ted] that an article included in Plaintiff's fee waiver request includes reporting supporting [such] statement." *See*, *e.g.*, Def.'s Resp. ¶¶ 1–27.

Epstein's ex-girlfriend and associate Ghislaine Maxwell of conspiring to recruit and sexually abuse underage girls with Epstein. *Id.* ¶ 4. Maxwell is currently serving a twenty-year sentence in federal prison. *Id.* ¶ 5.

These events gripped the interest of the public and national media. Many believe that the investigative files on Epstein and Maxwell—commonly referred to as the "Epstein files"—include interviews, flight logs, a "client list" which purportedly includes high-profile names, and thousands of other documents that remain concealed and inaccessible to the public. *Id.* ¶ 3.

During his 2024 campaign for president, candidate Donald Trump said multiple times that he would declassify and release the Epstein files. *Id.* ¶¶ 6–8. On February 21, 2025, after President Trump's election, then-Attorney General Pamela Bondi was asked by *Fox News* whether the Department of Justice ("DOJ") would "be releasing the list of Jeffrey Epstein's clients." *Id.* ¶ 9. She said that the list was "sitting on [her] desk right now to review." *Id.* At a White House event less than a week later, Attorney General Bondi handed out binders labeled, "The Epstein Files: Phase 1," to a selected group of "influencers." *Id.* ¶ 10. Attorney General Bondi indicated that the "Phase 1" binders contained "declassified" records from the Epstein files. *Id.* But in reality, the binders "consisted almost entirely of information that had previously been released." *Id.*

"Phase 1" was not well received. Reporting indicated that the "Phase 1" release prompted widespread criticism from the public, even among the President's supporters, some of whom indicated that the administration was involved in a cover-up. *Id.* ¶ 11. In March 2025, Attorney General Bondi told *Fox News* that the FBI's New York office had withheld some of the Epstein documents. *Id.* ¶ 12. She said that she had requested the documents and that a "truckload of evidence arrived" at DOJ, adding that DOJ "got them all." *Id.* In July 2025, however, Attorney

General Bondi said that these documents "turned out to be child porn" and therefore would not be released. *Id.* ¶ 13.

On July 7, 2025, the FBI and DOJ issued an unsigned, two-page memorandum stating that its "systematic review" of records related to Epstein "revealed no incriminating 'client list'" or "evidence that could predicate an investigation against uncharged third parties." *Id.* ¶ 14. The memorandum concluded that "no further disclosure would be appropriate or warranted." *Id.*

This unsigned memo "prompted widespread bipartisan backlash." *Id.* ¶ 15. On July 15, 2025, *NPR* "reported that Attorney General Bondi, FBI Director Kash Patel, and FBI Deputy Director Dan Bongino were at odds with each other over the handling of the Epstein case and ensuing public backlash." *Id.* ¶ 16. On July 15, 2025, *NPR* "described how prominent media personalities . . . criticized the Trump administration on how it was handling the files in the immediate aftermath of the . . . memo." *Id.* ¶ 17. *Reuters* polled American adults from July 15 to July 16 and found that 69% of respondents believed the federal government was hiding details about Epstein's client list. *Id.* ¶ 18.

On July 17, 2025, *The Wall Street Journal* reported that President Trump had given a birthday card to Epstein in 2003 that included a drawing of a naked woman, Trump's name written below the woman's waist in what appeared to be his handwriting, and a note referencing a "secret" the two men shared. *Id.* ¶ 19. A flurry of media activity ensued. President Trump and other White House officials said that the birthday card was fake. *Id.* ¶ 20. *The Wall Street Journal's* editorial board published an article considering "whether the matter merited the President appointing an independent special counsel to oversee the case," an idea that picked up on Representative Lauren Boebert's (R-CO) statement that a special counsel should be appointed to investigate Epstein's crimes if more Epstein files were not released. *Id.* ¶ 21. On the same day as *The Wall Street*

*Journal* article, President Trump posted on social media that he had directed Attorney General Bondi to "produce any and all pertinent Grand Jury testimony, subject to Court approval" related to the Epstein investigation. *Id*. ¶ 22.

On July 18, 2025, DOJ filed a motion in the Southern District of New York—signed by both Attorney General Bondi and Deputy Attorney General Todd Blanche—to unseal grand jury transcripts from the Epstein grand jury investigation. *Id*. ¶ 23. But the bad press continued. Reporting suggested that the unsealing request was a distraction that was unlikely to produce additional information, as the grand jury testimony constituted only a portion of Epstein-related material. *Id*. ¶ 24. That same day, U.S. Senator Richard Durbin (D-Ill.) sent a letter to Attorney General Bondi stating that, from March 14 to the end of March, she had "pressured" approximately 1,000 FBI personnel in 24-hour shifts to review an estimated 100,000 Epstein-related records and to "flag" any records in which President Trump was mentioned. *Id*. ¶ 25. Also that same day, podcaster Joe Rogan—one of the podcasters to interview candidate Trump during his 2024 campaign—criticized administration officials for not delivering on Epstein transparency as "promised" and indicated that "people are cynical" over the lack of transparency. *Id*. ¶ 26.

On July 20, 2025, *The New York Times* reported that an Epstein victim encountered Trump in 1995 in Epstein's office. *Id*. ¶ 27. It further reported that, afterward, the victim had "encouraged law enforcement to take a closer look into Trump." *Id*.

**B. DDF's FOIA Requests**

Against this backdrop, Plaintiff Democracy Defenders Fund ("DDF") submitted several FOIA requests to Defendant DOJ. The following requests are relevant here.[3]

[3] After filing its motion for summary judgment, DDF requested, and was granted, leave to file a Third Amended Complaint. *See* Dkt. No. 19. DDF's Third Amended Complaint includes additional FOIA requests. DDF has not indicated that its Third Amended Complaint alters its motion for summary judgment. Accordingly, the Court shall consider only those requests that DDF identifies in its motion for summary judgment, and it shall refer to DDF's

1. DDF's July 22, 2025, Request

On July 22, 2025, DDF submitted a FOIA request to DOJ's Criminal Division ("DOJ CRM"). This request concerned "the investigative files of Epstein and Maxwell and communications among senior DOJ officials relating to DOJ's investigations of Epstein and Maxwell." Def.'s Resp. ¶ 29. Specifically, DDF requested "all records from the inception of [DOJ's] investigations of Jeffrey Epstein and/or Ghislaine Maxwell to when this request is processed, of:"

> 1. All records relating to the Department of Justice's investigation(s) of Jeffrey Epstein that mention, refer to, or include the name of "Donald J. Trump", "Donald Trump", "President Trump" or other variations of his name, "Mar-a-Lago," or any code name, code word, pseudonym, or other cryptonym that is used to refer to Donald J. Trump or Mar-a-Lago, including records contained in its investigative files of Jeffrey Epstein.
>
> 2. All records relating to the Department of Justice's investigation(s) of Ghislaine Maxwell that mention, refer to, or include the name of "Donald J. Trump", "Donald Trump", "President Trump" or other variations of his name, "Mar-a-Lago," or any code name, code word, pseudonym, or other cryptonym that is used to refer to Donald J. Trump or Mar-a-Lago, including records contained in its investigative files of Ghislaine Maxwell.

July 22 DOJ CRM Request, Dkt. No. 14 at 25. DDF requested expedited processing for these requests pursuant to 5 U.S.C. § 552(6)(E) and 28 C.F.R. § 16.5(e)(1)(iv). *Id.* at 28–31.

2. DDF's July 28, 2025, Requests

On July 28, 2025, DDF submitted additional FOIA requests to DOJ CRM and the Office of the Attorney General ("OAG")/Office of the Deputy Attorney General ("ODAG"). These identical requests sought "records of all communications between top officials at DOJ and personnel related to the handling of the Epstein files and any DOJ investigations into the files."

---

Second Amended Complaint when resolving its motion for summary judgment, as that was the operative complaint at the time DDF moved for summary judgment.

Def.'s Resp. ¶ 36. Specifically, DDF requested "all records from January 20, 2025, to when this request is processed, of:"

1. Records of all communications, including, but not limited to, letters, faxes, emails, voicemails, direct messages, or any form of electronic message, regardless of whether maintained on an official device or account or a personal device or account, that refer to "Jeffrey Epstein" or "Ghislaine Maxwell," or any code name, code word, pseudonym, or cryptonym used for identifying "Jeffrey Epstein" or "Ghislaine Maxwell," that were sent from, received by, or transmitted to any Department of Justice official including, but not limited to, Attorney General Pamela Bondi, Deputy Attorney General Todd Blanche, Principal Associate Deputy Attorney General Emil Bove, FBI Director Kash Patel, and FBI Deputy Director Dan Bongino. This includes any attachments, including, but not limited to, meeting agendas, minutes, notes, memos, briefing materials, drafts, presentations, or analyses created, received, or reviewed by agency personnel. This request includes direct correspondence as well as communications facilitated by or through third parties.

2. Any communications, in any form, including audiovisual media such as digital video, VHS, DVD, or other similar format, discussing or explaining the process of how department officials should approach or address references to Donald Trump or Mar-a-lago [sic] appearing in any files related to the Jeffrey Epstein or Ghislaine Maxwell cases, including any communications that describe how to flag, categorize, or memorialize mentions of President Trump. This request includes, but is not limited to, videos circulated on unclassified networks within the Department.

3. Electronic copies of all calendar entries or meeting invitations for any Department officials, including, but not limited to, Attorney General Bondi, Deputy Attorney General Todd Blanche, Principal Associate Deputy Attorney General Emil Bove, FBI Director Kash Patel, or FBI Deputy Director Dan Bongino, including any calendars maintained on their behalf, that reference "Jeffrey Epstein" or "Ghislaine Maxwell" or any code name, code word, pseudonym, or cryptonym used for identifying "Jeffrey Epstein" or "Ghislaine Maxwell". For any such calendar entries or meeting invites produced, please also provide any related materials, including recordings, transcripts, agendas, minutes, notes, memos, briefing materials, drafts, presentations, or analyses created, received, or reviewed for use during, or in preparation of, such meeting.

4. Any communications, correspondence, or documents listing or containing the identities of people who were clients or associates of Jeffrey Epstein, including any documents listing or containing the identities of people who

> were invited to Epstein's properties, including invitations, calendar schedules, and flight logs.

July 28 DOJ CRM Request, Dkt. No. 14 at 142–43. Again, DDF requested expedited processing pursuant to 5 U.S.C. § 552(6)(E) and 28 C.F.R. § 16.5(e)(1)(iv). *Id.* at 146–49.

### C. The Present Litigation

DDF initiated this litigation on August 21, 2025. *See* Dkt. No. 1. DDF's initial Complaint concerned only its July 22 DOJ CRM Request; it alleged that DOJ CRM had failed to conduct adequate searches for responsive records, wrongfully withheld non-exempt responsive records, failed to grant DDF's request for waiver of fees, and failed to grant DDF's request for expedited processing. *Id.* On September 11, 2025, DDF filed a First Amended Complaint as of right. *See* Dkt. No. 9. DDF's First Amended Complaint added the July 28 DOJ CRM Request and raised the same allegations. *Id.* Shortly thereafter, the Court granted DDF leave to file a Second Amended Complaint, which added the July 28 OAG/ODAG Request. *See* Am. Compl., Dkt. No. 14.

DDF now moves for summary judgment on its request for expedited processing on these three requests under 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e)(1)(iv).

## II. LEGAL STANDARD

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Doe v. Columbia*, 151 F.4th 435, 445 (D.C. Cir. 2025) (cleaned up).

The party seeking expedited review of a FOIA request has the burden of showing that expedition is warranted. *See Democracy Forward Found. v. Dep't of Just.*, 813 F. Supp. 3d 1, 8 (D.D.C. 2025). FOIA provides for "expedited processing of requests for records" in (1) "cases in which the person requesting the records demonstrates a compelling need," and (2) "in other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i).

Under the first expedited processing prong, the term "compelling need" means either (i) "that a failure to obtain requested records on an expedited basis . . . could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or (ii) "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." *Id.* § 552(a)(6)(E)(v). "[A] district court must review de novo an agency's denial of a request for expedition" under this first expedited processing prong. *Al-Fayed v. C.I.A.*, 254 F.3d 300, 308 (D.C. Cir. 2001).

Under the second prong, DOJ has promulgated regulations that provide, in relevant part, that requests "shall be processed on an expedited basis whenever it is determined that they involve . . . [a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv). "A regulation promulgated in response to [the second prong's] express delegation of authority to an individual agency is entitled to judicial deference, as is each agency's reasonable interpretation of its own such regulations." *Al-Fayed*, 254 F.3d at 307 n. 7 (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001)). However, when a case "involves a constructive denial, the court has no agency reasoning to which it could defer—it has it only the post hoc arguments of Government counsel." *Democracy Forward*, 813 F. Supp. 3d at 9 (citing *Kisor v. Wilkie*, 588 U.S. 558, 576–79 (2019)). Accordingly, a court need not "give blanket deference [to an agency's] constructive denial of [an] expedited-processing request[]." *Id.*

## III. ANALYSIS

DDF argues that it "is entitled to expedited processing on two bases." Pl.'s Mem. at 15. First, DDF argues that it is entitled to expedition under DOJ's own regulations because it "has established that there is no material factual dispute that [its] FOIA requests involve a matter of

widespread and exceptional media interest in which there exist possible questions about government integrity that affect public confidence." *Id.* Second, DDF argues that it is entitled to expedited processing under the "compelling need" prong of the FOIA statute because DDF "is an entity primarily engaged in disseminating information and there is urgency to inform the public of the information sought in the request, which relates to the federal government's activities." *Id.*

The Court shall address each argument in turn. Upon doing so, the Court concludes that DDF is entitled to expedited processing under DOJ's regulations but not the "compelling need" prong of FOIA.

**A. DDF has shown that it is entitled to expedited processing under DOJ's regulations because its requests concern matters of widespread and exceptional media interest in which there exist possible questions about government integrity that affect public confidence.**

To qualify for expedited review under 28 C.F.R. § 16.5(e)(1)(iv), a requestor must show (1) that there is "widespread and exceptional media interest" in a specific matter, and (2) that coverage of the specific matter raises "possible questions about the government's integrity that affect public confidence." *Democracy Forward*, 813 F. Supp. 3d at 10 (citing 28 C.F.R. § 16.5(e)(1)(iv)).

In evaluating whether there is widespread and exceptional media interest, "courts in this District consider (1) the number of articles cited in the expedited processing request, (2) the dates those articles were published, (3) whether those articles were published in a variety of publications, and (4) whether those articles indicate that there is widespread national attention on the issue." *Id.* at 10–11. As to whether the relevant coverage raises possible questions of government integrity that affect public confidence, "a requestor need not point to actual evidence of government misconduct; they need only show *possible questions* regarding government integrity." *Id.* at 11. "The primary way to determine whether such possible questions exist is by examining the state of

public coverage of the matter at issue, and whether that coverage surfaces possible ethics issues so potentially significant as to reduce public confidence in governmental institutions." *Oversight v. U.S. Dep't of Just.*, 292 F. Supp. 3d 501, 508 (D.D.C. 2018) (RJL).

The Court shall consider whether DDF has met its burden on this standard with respect to each of its FOIA requests at issue. Because this case concerns DOJ's constructive denial of expedited processing, the Court shall review the record *de novo*. *See Democracy Forward*, 813 F. Supp. 3d at 9. Upon doing so, the Court concludes that DDF is entitled to expedited processing under the relevant DOJ regulation.

1. DDF's July 22, 2025, Request

DDF has shown that it is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv) for its July 22, 2025, request to DOJ CRM, which sought records from DOJ's investigation of Epstein and/or Maxwell that referred to variations of the terms "Donald Trump" and "Mar-a-Lago." *See* Dkt. No. 22 at 44.

DDF's July 22 request clearly showed that there was "widespread and exceptional media interest" in DOJ's investigation into Epstein and Maxwell and its connection to the keywords identified by DDF. *Democracy Forward*, 813 F. Supp. 3d at 11. DDF's request cites more than two-dozen articles concerning the connection between DOJ's investigation of Epstein and Maxwell and the keywords identified by DDF. *See* July 22 DOJ CRM Request, Dkt. No. 14 at 25–33. These articles were written close in time to DDF's request and "appeared in a range of prominent newspapers," including *The New York Times*, *The Washington Post*, and *The Wall Street Journal*; "major wire services," including *The Associated Press* and *Reuters*; and "well-known broadcast outlets," including ABC, BBC, Fox News, and NPR. *Democracy Forward*, 813 F. Supp. 3d at 12. Most importantly, the substance of these articles indicates widespread national attention to the issue, as illustrated in the following titles: "Trump Lashes Out at Supporters for Fixating on

'Epstein Hoax;'"[4] "An Accuser's Story Suggests How Trump Might Appear in the Epstein Files;"[5] "Trump tells supporters not to 'waste time' on Epstein files. They're not happy."[6] DDF has therefore met the first prong of 28 C.F.R. § 16.5(e)(1)(iv).

DDF has also established that this widespread media coverage raises "possible questions about the government's integrity that affect public confidence." *Democracy Forward*, 813 F. Supp. 3d at 12 (quoting 28 C.F.R. § 16.5(e)(1)(iv)). "The primary way to determine whether such possible questions exist is by examining the state of public coverage of the matter at issue, and whether that coverage surfaces possible ethics issues so potentially significant as to reduce public confidence in governmental institutions." *Oversight*, 292 F. Supp. 3d at 508. A *Reuters* poll cited by DDF in its request revealed that 69% of Americans "thought the federal government was hiding details about Epstein's clients." *See* Jason Lange, *Trump faces backlash as 69% believe Epstein details concealed, Reuters/Ipsos poll finds*, Reuters (Jul. 17, 2025), https://perma.cc/Y73H-89CQ. Furthermore, reporting on the issue highlighted the apparent inconsistency between Donald Trump's pre-election promise to declassify the Epstein files and his administration's post-election handling of the files. *See*, *e.g.*, Ashley Oliver, *10 reasons the DOJ and FBI face backlash over Epstein files flop*, Fox News (July 10, 2025), https://perma.cc/2YSW-3UBK. This reporting also explored Donald Trump's friendship with Epstein—for instance, the *Wall Street Journal* "reported that President Trump had written a birthday note to Epstein in 2003, which included a drawing of

[4] July 22 DOJ CRM Request Letter, Dkt. No. 14 at 30 n. 26 (citing Annie Linskey and Jasmine Li, *Trump Lashes Out at Supporters for Fixating on "Epstein Hoax."* Wall St. Journal (Jul. 16, 2025), https://www.wsj.com/politics/policy/trump-jeffrey-epstein-files-supporters-4021019d?gaa_at).

[5] *Id*. at 29 n. 20 (citing Mike Baker and Michael S. Schmidt, *An Accuser's Story Suggests How Trump Might Appear in the Epstein Files*, The New York Times (July. 20, 2025), https://www.nytimes.com/2025/07/20/us/politics/epstein-employee-trump-investigation.html).

[6] *Id*. at 29 n. 21 (citing Stephen Fowler, *Trump tells supporters not to 'waste time' on Epstein files. They're not happy*, NPR (Jul. 15, 2025), https://www.npr.org/2025/07/14/nx-s1-5467151/trump-epstein-files-doj-fbi-maga).

a naked woman, Trump's name written below the woman's waist in what appeared to be his handwriting, and a note referencing a 'secret' the two men shared." Def.'s Resp. ¶ 19 (citing multiple sources).[7] All in all, the coverage cited by DDF surfaced possible ethical issues that had the potential to reduce public confidence in governmental institutions.

Accordingly, the Court concludes that DDF has shown it is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv) on its July 22, 2025, request to DOJ CRM.

2. DDF's July 28, 2025, Requests

DDF has also shown that it is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv) for its July 28, 2025, requests to DOJ CRM, and OAG/ODAG. These identical requests sought records of communications between top officials at DOJ and personnel related to the handling and investigation of the Epstein files. Def.'s Resp. ¶ 36. In other words, while DDF's July 22 request concerned records from the Epstein files that contained certain keywords, its July 28 requests concerned records regarding the federal government's investigation and handling of the Epstein files.

DDF has shown that its July 28 requests concerned a matter of "widespread and exceptional media interest." *Democracy Forward*, 813 F. Supp. 3d at 10. Again, DDF's requests cite dozens of timely articles from a variety of reputable sources. *See* July 28 DOJ CRM Request, Dkt. No. 14 at 142–51. These articles indicated widespread, ongoing national attention to the issue of the government's handling of the Epstein files.[8] The coverage also emphasized that the high-level

---

[7] *See also* Alexandra Hutzler, *What Trump has said about Jeffrey Epstein over the years, including on 2024 campaign trail*, ABC News (Jul. 16, 2025), https://perma.cc/N9FC-LRF5; July 22 DOJ CRM Letter, Dkt. No. 22 at 45 n. 6 (citing Luke Broadwater, *A Timeline of What We Know About Trump and Epstein*, New York Times (Jul. 19, 2025), https://www.nytimes.com/2025/07/17/us/politics/timeline-trump-epstein.html).

[8] *See*, *e.g.*, July 28 DOJ CRM Request, Dkt. No. 14 at 148 n. 30 (citing *Trump's "Epstein Files" Problem*, Washington Post Podcast (Jul. 15, 2025), https://www.washingtonpost.com/podcasts/post-reports/trumps-epstein-files-problem/; Jeremy Roebuck and Mark Berman, *Justice Dept. asks court to release Epstein grand jury testimony*, Washington Post (Jul. 18, 2025), https://www.washingtonpost.com/national-security/2025/07/18/bondi-epstein-files-documents-

officials identified in DDF's requests were intimately involved with handling the Epstein files. For instance, "*NPR* reported that Attorney General Bondi, FBI Director Kash Patel, and FBI Deputy Director Dan Bongino were at odds with each other over the handling of the Epstein case and ensuing public backlash." Def.'s Resp. ¶ 16. DDF also identified reports that the President had directed Attorney General Bondi to produce Grand Jury testimony related to Epstein, and that Attorney General Bondi and Deputy Attorney General Blanche had signed a motion to unseal such transcripts shortly thereafter. *Id.* ¶¶ 22–23. Considering the extensive media coverage identified in DDF's requests, it has met the first prong of 28 C.F.R. § 16.5(e)(1)(iv).

DDF has also established that this widespread media coverage raises "possible questions about the government's integrity that affect public confidence." *Democracy Forward*, 813 F. Supp. 3d at 12 (quoting 28 C.F.R. § 16.5(e)(1)(iv)). Again, DDF's requests cite to polling that revealed 69% of Americans "thought the federal government was hiding details about Epstein's clients." *See* Jason Lange, *Trump faces backlash as 69% believe Epstein details concealed, Reuters/Ipsos poll finds*, Reuters (Jul. 17, 2025), https://perma.cc/Y73H-89CQ. DDF's requests also cite reports that raise possible questions about the conduct of high-level officials identified by DDF. With respect to former Attorney General Bondi, for instance, there are reports documenting her seemingly contradictory statements about the existence of certain Epstein files, in addition to reports that she "had 'pressured' approximately 1,000 FBI personnel in 24-hour shifts to review an estimated 100,000 Epstein-related records and to 'flag' any records in which President Trump was mentioned." Def.'s Resp. ¶ 25; *id.* ¶¶ 9–13. All in all, the reporting identified by DDF raises

grand-jury testimony-doj/; Sarah Ellison, *How MAGA influencers put pressure on Trump, Bondi over Epstein*, Washington Post (Jul. 19, 2025), https://www.washingtonpost.com/politics/2025/07/19/maga-influencers-trump-epstein//); *id.* at 144 n. 10 (citing Sadie Gurman, et al., *Justice Department Told Trump in May that His Name is Among Many in the Epstein Files*, Wall Street J. (July 23, 2025), https://www.wsj.com/politics/justice-department-told-trump-name-in-epstein-files 727a8038?mod=hp_trendingnow_article_pos1); *id.* at 144 n. 13 (citing Chris Cameron, *Trump Really Wants to Stop Talking About Epstein: A Timeline*, NY Times (July 23, 2025), https://www.nytimes.com/2025/07/23/us/politics/trump-epstein-distraction-timeline.html).

possible questions of government integrity that would reasonably affect public confidence in government.

Accordingly, the Court concludes that DDF is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv) for its July 28, 2025, requests to DOJ CRM, and OAG/ODAG.

3. DOJ's Argument that DDF's Requests are "Overbroad"

DOJ argues that any order of expedition must be narrowed to exclude any request for records that is "overbroad." Def.'s Opp'n at 23. A request for expedited processing under the applicable DOJ regulation "must be reasonably tailored to the matter generating media attention." *Democracy Forward*, 813 F. Supp. 3d at 12. The Court "is largely satisfied that [DDF's] requests are closely related to" the underlying matters generating the relevant media attention. *Id*. The Court agrees with DOJ, however, with respect to two specific aspects of DDF's July 28, 2025, requests to DOJ CRM and OAG/ODAG. The relevant requests are DDF's request for

> Records of all communications, including, but not limited to, letters, faxes, emails, voicemails, direct messages, or any form of electronic message, regardless of whether maintained on an official device or account or a personal device or account, that refer to "Jeffrey Epstein" or "Ghislaine Maxwell," or any code name, code word, pseudonym, or cryptonym used for identifying "Jeffrey Epstein" or "Ghislaine Maxwell," that were sent from, received by, or transmitted to ***any Department of Justice official including, but not limited to,*** Attorney General Pamela Bondi, Deputy Attorney General Todd Blanche, Principal Associate Deputy Attorney General Emil Bove, FBI Director Kash Patel, and FBI Deputy Director Dan Bongino. This includes any attachments, including, but not limited to, meeting agendas, minutes, notes, memos, briefing materials, drafts, presentations, or analyses created, received, or reviewed by agency personnel. This request includes direct correspondence as well as communications facilitated by or through third parties.

and

> Electronic copies of all calendar entries or meeting invitations for ***any Department officials***, ***including, but not limited to,*** Attorney General Bondi, Deputy Attorney General Todd Blanche, Principal Associate Deputy Attorney General Emil Bove, FBI Director Kash Patel, or FBI Deputy Director Dan Bongino, including any calendars maintained on their behalf, that reference "Jeffrey Epstein" or "Ghislaine Maxwell" or any code name, code word, pseudonym, or cryptonym used for

> identifying "Jeffrey Epstein" or "Ghislaine Maxwell". For any such calendar entries or meeting invites produced, please also provide any related materials, including recordings, transcripts, agendas, minutes, notes, memos, briefing materials, drafts, presentations, or analyses created, received, or reviewed for use during, or in preparation of, such meeting.

July 28 DOJ CRM Request, Dkt. No. 14 at 142–43 (emphasis added).

The Court finds the highlighted language in the above requests to be overbroad. The record supports expedition for these requests as they relate to the specifically identified DOJ officials (i.e., "Attorney General Pamela Bondi, Deputy Attorney General Todd Blanche, Principal Associate Deputy Attorney General Emil Bove, FBI Director Kash Patel, and FBI Deputy Director Dan Bongino"). *Id.* These officials were the focus of the media reports cited by DDF in its July 28 requests. But the record does not support expedition for these requests as they relate to "any [DOJ] official." *Id.* The reports cited by DDF did not raise possible questions about the government's integrity outside of the specific officials identified in DDF's requests. Requiring DOJ to expedite processing for this request as to "any [DOJ] official" would therefore be unwarranted. *See Democracy Forward*, 813 F. Supp. 3d at 12.

Under the applicable DOJ regulation, DDF is entitled to expedited processing on the entirety of its July 22 request to DOJ CRM. DDF is also entitled to expedited processing on the bulk of its July 28 requests to DOJ CRM and OAG/ODAG. The only portions of DDF's July 28 requests to which it is *not* entitled to expedited processing are the portions in which DDF requests records in connection to "any [DOJ] official;" the Court has highlighted the relevant language within the context of the complete request above.[9] These specific portions of DDF's July 28

[9] For the avoidance of doubt, these portions are contained in Request #1 and Request #3 in both of DDF's July 28 requests. *See* July 28 DOJ CRM Request, Dkt. No. 14 at 142–43; July 28 OAG/ODAG Request, Dkt. No. 14 at 169–70.

requests are overbroad. Accordingly, the Court shall grant DDF's request for expedited processing in full *except for* the highlighted text in the above requests.

* * *

In sum, the Court concludes that the entirety of DDF's July 22, 2025, request to DOJ CRM is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv). The Court further concludes that the bulk of DDF's July 28, 2025, requests to DOJ CRM and OAG/ODAG are entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv); however, as detailed above, *supra* Section III.A.3, the Court shall narrow the scope of DDF's first and third requests to require only that DOJ provide expedited processing as to the specific DOJ officials identified in the request and not "any [DOJ] official." Accordingly, the Court shall **GRANT IN PART** and **DENY IN PART** DDF's [15] Motion for Summary Judgment with respect to its requests for expedited processing under 28 C.F.R. § 16.5(e)(1)(iv).

**B. DDF has not shown that it is entitled to expedited processing under FOIA's "compelling need" standard because it is has not shown that it is an entity "primarily engaged in disseminating information."**

FOIA provides for "expedited processing of requests for records" in "cases in which the person requesting the records demonstrates a compelling need." 5 U.S.C. § 552(a)(6)(E)(i). "[W]ith respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity" constitutes a "compelling need." *Id.* § 552(a)(6)(E)(v). This standard is to be "narrowly applied" given "the finite resources generally available for fulfilling FOIA requests." *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001) (citation omitted). A district court must review an agency's decision

about whether to grant expedited processing *de novo*, based on the record that was before the agency at the time of its decision. *Al-Fayed v. C.I.A.*, 254 F.3d 300, 305, 308 (D.C. Cir. 2001).[10]

DOJ argues that (i) DDF is not "primarily engaged in disseminating information," and (ii) that, even if it is, it has not shown an "urgency to inform the public concerning actual or alleged Federal Government activity." Def.'s Opp'n at 11–17. For the reasons stated below, the Court concludes that, on the present record, DDF has not shown that it is entitled to expedited processing under FOIA's "compelling need" standard because it has not shown that it is "primarily engaged in disseminating information." Because DDF has not met the first prong of this standard, the Court shall not consider whether it has met the second.

Courts "must be cautious in deeming non-media organizations as persons primarily engaged in information dissemination." *Energy Pol'y Advocs. v. U.S. Dep't of the Interior*, No. 21-cv-1247 (JEB), 2021 WL 4306079, at *2 (D.D.C. Sept. 22, 2021) (quoting *Landmark Legal Found. v. E.P.A.*, 910 F. Supp. 2d 270, 275–76 (D.D.C. 2012) (RCL)). "Although courts in this Circuit and elsewhere have routinely held that media organizations and newspapers qualify under this category, in light of the pertinent legislative history, other types of organizations have been held to not qualify, unless information dissemination is also their main activity, and not merely incidental to other activities that are their actual, core purpose." *Progress v. Consumer Fin. Prot. Bureau*, No. 17-cv-686 (CKK), 2017 WL 1750263, at *4 (D.D.C. May 4, 2017) (collecting cases). The Court's determination of whether DDF qualifies as a person primarily engaged in information dissemination "is based solely on the record before [DOJ]," as required by law. *Id.*

---

[10] DOJ did not explicitly deny each of DDF's requests for expedited processing at issue here. However, DOJ "does not dispute that this Court can proceed with *de novo* review as though the agency had expressly denied each of [DDF's] requests for expedited processing," and "[t]he Court therefore proceeds to review the agency's decisions on that basis." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 826 F. Supp. 3d 73, 86–87 (D.D.C. 2026) (CKK).

In the requests at issue, DDF explained that its "core mission is to defend the rule of law, fight corruption, and protect elections using a variety of tools including publication of information concerning ongoing activities of the government." *See* July 22 DOJ CRM Request, Dkt. No. 14 at 28.[11] DDF further explained that its "public dissemination and media outreach are extensive," and that "[t]hrough a combination of investigative reports, in-depth analyses, press releases, and dynamic engagement on multiple digital and traditional media channels, DDF ensures that critical information reaches a wide spectrum of stakeholders." *Id*. at 29. To support these claims, DDF cited articles written by its leadership that detail DDF's past efforts to inform the public about possible government corruption. *See id*. at 28 n. 16 (citing Virginia Canter, et al., *Why we 'Democracy Defenders' are demanding information about DOGE*, MSNBC (Dec. 27, 2024), https://perma.cc/XS6W-Q5RN (announcing that DDF had "begun [an] inquiry into DOGE by filing [FOIA] requests across the federal government" because "[w]ithout [the requested] records, the public will remain in the dark . . . and will therefore not be able to assess whether DOGE will serve the nation")). DDF also cited to its website, "where it provides information related to its activities which can be accessed by the public." *Id*. at 28.

Although it is a close call, the Court concludes that, on the present record, DDF has not established that it is primarily engaged in disseminating information. DDF argues that this case is analogous to *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) (RCL), in which Judge Royce C. Lamberth held that the Leadership Conference on Civil Rights was "primarily engaged in the dissemination of information regarding civil rights" because its mission was "to serve as the site of record for relevant and up-to-the minute civil rights news

[11] *See also* July 28 DOJ CRM Request, Dkt. No. 14 at 145; July 28 OAG-ODAG Request, Dkt. No. 14 at 172. Outside of the requested records, DDF's July 22 Request and its July 28 Requests mirror each other. The Court shall therefore cite to DDF's July 22 Request as the representative request.

and information." *Id*. at 260. The Court, however, finds this case more akin to *Landmark Legal Foundation v. E.P.A.*, 910 F. Supp. 2d 270 (D.D.C. 2012) (RCL). In *Landmark Legal*, Judge Lamberth held that the Landmark Legal Foundation had not shown that it was "primarily, and not just incidentally, engaged in information dissemination" because it "only stated that '*as part of* its mission as a tax-exempt, public interest law firm, Landmark *investigates, litigates*, and publicizes instances of improper and/or illegal government activity' and that '*[a]mong* [its] primary activities is to disseminate to the public about the conduct of governmental agencies.'" *Id*. at 276 (quoting evidence in the record) (emphasis in original). Judge Lamberth found that the Landmark Legal Foundation's additional functions outside of information dissemination distinguished it from the Leadership Conference on Civil Rights, explaining that "[a] contrary reading of the statutory requirement would allow nearly any organization with a website, newsletter, or other information distribution channel to qualify as primarily engaged in disseminating information." *Id*.

The Court agrees with Judge Lamberth's reasoning in *Landmark Legal* and finds it instructive here. In its requests, DDF stated that its "core mission is to defend the rule of law, fight corruption, and protect elections *using a variety of tools* including publication of information concerning ongoing activities of the government." July 22 DOJ CRM Request, Dkt. No. 14 at 28 (emphasis added). Upon review of DDF's website, it appears that DDF's primary tools are litigation and advocacy, with information dissemination being incidental to these primary tools. For instance, DDF's website describes DDF as "a bipartisan, experienced team of litigators, constitutional experts, policy researchers, former public servants, and communications strategists;"[12] lists several recent litigation "victories" that, while significant, do not relate to

[12] See *Team & Board*, DEMOCRACY DEF. FUND (last accessed Sept. 29, 2026), https://perma.cc/Y5AD-G3N5.

information dissemination;[13] and states that DDF "use[s] litigation, policy advocacy, strategic communications, and grassroots mobilization to ensure our elections are free, fair, and secure."[14] Mindful that the "specified categories for compelling need are intended to be narrowly applied" and that courts therefore "must be cautious in deeming non-media organizations as persons primarily engaged in information dissemination," *Energy Pol'y Advocs.*, 2021 WL 4306079, at *2 (citations omitted), the Court finds that, on the present record, DDF has not shown as a matter of law that it is "primarily, and not just incidentally, engaged in information dissemination," *Landmark Legal*, 910 F. Supp. 2d at 276.[15]

* * *

In sum, the Court concludes that DDF has not shown that it is "primarily engaged in disseminating information" under 5 U.S.C. § 552(a)(6)(E)(v) because, on the present record, DDF's information dissemination is incidental to its primary activities of litigation and advocacy. DDF is therefore not entitled to judgment as a matter of law on its request for expedited processing under 5 U.S.C. § 552(a)(6)(E)(i). Accordingly, the Court shall **DENY IN PART** DDF's [15] Motion for Summary Judgment with respect to its request under 5 U.S.C. § 552(a)(6)(E)(i).

---

[13] See *Defend the Rule of Law*, DEMOCRACY DEF. FUND (last accessed Sept. 29, 2026), https://perma.cc/8WYV-4ZNG.

[14] See *Mission & History*, DEMOCRACY DEF. FUND (last accessed Sept. 29, 2026), https://perma.cc/69VW-YLUL.

[15] Because DDF has not satisfied the first prong of the relevant "compelling need" standard, the Court does not reach the second prong (i.e., whether DDF has shown an "urgency to inform the public concerning actual or alleged Federal Government activity").

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the entirety of DDF's July 22, 2025, request to DOJ CRM is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv). The Court further concludes that the bulk of DDF's July 28, 2025, requests to DOJ CRM and OAG/ODAG are entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv); however, as detailed above, *supra* Section III.A.3, the Court shall narrow the scope of DDF's first and third requests to require only that DOJ provide expedited processing as to the specific DOJ officials identified in the request and not "any [DOJ] official." Finally, although DDF argues that FOIA's "compelling need" provision, 5 U.S.C. § 552(a)(6)(E), provides a supplemental basis for expedition, the Court finds that DDF has not met the statutory standard for "compelling need" because it has not shown that it is "primarily engaged in disseminating information."

Accordingly, it is hereby:

**ORDERED** that, with respect to DDF's request under 28 C.F.R. § 16.5(e)(1)(iv) for expedited processing on its July 22, 2025, request to DOJ CRM, DDF's [15] Motion for Summary Judgment is **GRANTED**;

**ORDERED** that, with respect to DDF's request under 28 C.F.R. § 16.5(e)(1)(iv) for expedited processing on its July 28, 2025, requests to DOJ CRM and OAG/ODAG, DDF's [15] Motion for Summary Judgment is **GRANTED IN PART** as to the bulk of DDF's requests for records and **DENIED IN PART** as to the portions of DDF's first and third requests that request records from DOJ officials other than those specifically identified in the request; and

*Continue on next page.*

**ORDERED** that, with respect to DDF's request under FOIA's "compelling need" provision, 5 U.S.C. § 552(a)(6)(E), for expedited processing on its July 22, 2025, request to DOJ CRM and its July 28, 2025, requests to DOJ CRM and OAG/ODAG, DDF's [15] Motion for Summary Judgment is **DENIED**.

**SO ORDERED.**

**Dated:** September 30, 2026

Colleen Kollar-Kotelly

COLLEEN KOLLAR-KOTELLY
United States District Judge